D'ELLA BREEZE, Special Adm'r of the Estate of Lana Dare, Deceased, Plaintiff-Appellant, v. ROBERT PAYNE et al., Defendants-Appellees.

Fifth District   No. 5—87—0721

Opinion filed April 24, 1989.

Michael J. Hanagan, of Hanagan & Dousman, of Mt. Vernon, for appellant.

Patrick J. Hitpas, of Patrick J. Hitpas, P.C., of Carlyle, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, D'Ella Breeze, as special administrator of the estate of Lana Dare, deceased, appeals from the summary judgment granted by the trial court in favor of the defendants, Robert Payne and Marcella Payne. Ten years old at the time of her death on June 1, 1984, Lana Dare collided with a truck on that date while riding a small two-wheeled motorbike owned by the defendants, who were her aunt and uncle. In granting summary judgment the trial court determined that the defendants had "no legal duty to avoid any of the acts or omissions which are alleged as elements of negligence in the Second Amended Complaint," the pleading upon which defendants' motion for summary judgment was based. The plaintiff presents a single issue for review, stated as "[w]hether there is a duty to warn, supervise, or instruct minor children when a defendant's own activities create a foreseeable risk of harm."

In her second amended complaint consisting of two counts, filed on June 18, 1987, the plaintiff, who is Lana Dare's mother, alleged that on June 1, 1984, prior to the decedent's injury and death, "one or both of the defendants told Lana Dare that she could ride a certain Italjet motorbike owned by Robert Payne." Plaintiff alleged further that "[b]efore and at the time of the occurrence" leading to Lana Dare's injury and death

"the defendants were negligent in one or more of the following ways:

(a) Failed to tell Lana Dare that she should not ride the motorbike unless one of the adults was present to help her, when defendants knew or should have known that such failure endangered Lana Dare's safety.

(b) Failed to tell their own children that they should not start the motorbike for Lana to ride it unless one of the adults was present to help Lana, when defendants knew or should have known that such failure endangered Lana Dare's safety.

(c) Failed to adequately supervise Lana Dare and their own children, when defendants knew or should have known that such failure endangered Lana Dare's safety.

(d) Failed to properly instruct Lana Dare in the operation of the motorbike, when defendants know or should have known

that such failure endangered her safety."

On June 25, 1987, the defendants filed a motion to dismiss both counts of the second amended complaint for failure to state any duty on the part of the defendants either to perform any of the acts alleged to be required or to refrain from any of the omissions alleged. The defendants contended that as a matter of law the defendants had no duty to perform any of the acts alleged to be required or to refrain from any of the omissions alleged. Following argument, the trial court on July 1, 1987, denied the defendants' motion to dismiss.

On July 1, 1987, the defendants moved for summary judgment as to both counts of the second amended complaint. In support of the motion were attached the discovery depositions of D'Ella Breeze, taken on April 24, 1985, and again on March 24, 1987, and of Robert Payne and his daughter, Jessica Payne, taken on April 24, 1985.

Robert Payne testified during his deposition that Lana Dare and her sister, Carrie Dare, had come to his house to visit sometime after noon on the day in question. He said that "quite a bit" before the collision occurred at about 4:30 p.m. he had asked Lana in his wife's presence if she wanted to ride the motorbike and "she acted like she didn't want to." The motorbike was small, having a 50 c.c. engine, and was apparently intended for use by children, being uncomfortable for an adult to use. He stated further, "I asked her if she would like to learn how to ride it and I think she said, 'Not right now.' I told her it was real easy to ride but she still wasn't interested so I more or less dropped the subject." He testified that he had started his own motorcycle, a Harley Davidson equipped with a 1340 c.c. engine and much larger than the motorbike, and "they were all wanting a ride, which was Lana and Jessica and Carrie, and the two young boys [two of the defendants' sons] were out there also." He said he had given Lana a ride first, for a total distance of approximately two miles. After he dropped Lana off and Carrie got on the motorcycle, he gave Carrie a similar ride, part of which was on Illinois Route 15, which is adjacent to the defendants' property. When he dropped Lana off, the motorbike was in the front yard of the Payne residence. Immediately upon returning from giving Carrie her ride, he saw "smoke down on the highway and a motorcycle laying [sic] at the side of the road and a child laying [sic] in the middle of the road"; he discovered that the child was Lana Dare. She had ridden the motorbike and appeared to have lost control of it, inadvertently having gone down a grassy embankment bordering the defendants' property and onto Illinois Route 15, where she struck the side of an oncoming truck.

Robert Payne said Lana had told him that she had ridden a

"three wheeler" at her home. He continued:

> "I think that is when I asked her if she wanted to ride that motorcycle [the motorbike] and I asked her, I said, 'Do you have a three wheeler over at your house?' She said yes. I asked her if she rode it. She said yes. I told her there wasn't a whole lot of difference in the way they operate."

The brakes of the motorbike in question were operated by the use of a foot lever for the back brake and a hand lever for the front brake. The gearshift was operated by using the left foot. The defendant stated again:

> "I told Lana if she wanted to ride the bike—I thought she would but she wasn't interested in it. I told her it was very easy to learn, and I asked her if she had any experience like on a three wheeler and she told me yes."

He stated further:

> "She wasn't interested at that time. If I had known she might try to ride it later I would have went ahead and explained to her anyway, but I just dropped it since she didn't act like she was interested. I didn't have a chance to tell her where the brakes was or nothing. She wasn't interested at that time."

Robert Payne indicated that he owned two other motorcycles at the time, an 80 c.c. Suzuki and a "350 Honda," neither of which was operable on the day in question. His own children, he said, never rode on the "bank." He thought he had told his children Jessica and Jeremy not to operate the motorbike unless he or their mother was able to watch them. He did not recall when he had last told this to the children prior to the accident leading to Lana's death.

Jessica Payne testified at her discovery deposition, at which time she was 10 years old, that Lana Dare had arrived with Carrie Dare at the witness' home at about 1:30 p.m. on the day she was injured and died. The witness' father, Robert Payne, had given Lana and apparently the witness' brother Jeremy a ride on his motorcycle. Thereafter he gave a ride on his motorcycle to Carrie Dare and the witness' brother Jared, about four or five years old at the time. Lana Dare, she said, had asked her to start the motorbike that Lana was operating when she was fatally injured. Using the kick starter, Jessica started the motorbike in the presence of her brother Jeremy, six years old at the time. Jeremy moved the motorbike off the kickstand for Lana. When Jessica started the motorbike, her mother, she said, was in the house, and her father was giving Carrie and Jared a ride on his motorcycle. Jessica put the motorbike into first gear for Lana and told Lana how to operate the back brake using her foot and the throt-

tle on the handlebar. She did not tell Lana how to operate the front brake or where the gearshift was. As Lana was riding the motorbike, Jessica went into the house to tell her mother that Lana was doing so and to have her mother come out to see Lana ride it. When Jessica and her mother emerged from the house, Jessica saw Lana and the motorbike "wrecked" on the road near their house. Jessica testified that earlier in the day her father had told Lana and Carrie that, if they wanted to learn to ride the motorbike, he would teach them. Twice earlier in the day, Jessica said, Lana had watched as Jessica had ridden the motorbike. Jessica said that when she and Jeremy had ridden the motorbike they had done so with someone watching them, although her brother Justin, about 10 or 11 years old at the time, had ridden it with no one watching him. On the day of the occurrence, Justin was the only one of the defendants' four children who was not at home. When Jessica and Jeremy rode the motorbike, they rode it, she said, "where Lana went, only we went in a circle."

D'Ella Breeze testified that her husband had a "three wheeler" that Lana had operated while "supervised" on one to three occasions about "a year or so before" her death. She said that Robert Payne had given Lana and others rides on his motorcycle at the witness' mother's house on some occasions prior to this incident. Carrie Dare was 11 or 12 years old when this incident occurred. The Dare children had routinely visited the Paynes about two or three times a month since their infancy. The two families lived about a mile apart. June 1, 1984, was the first day that the Dare girls had been to the Payne residence since the Paynes had acquired the motorbike on which Lana was injured.

In the motion for summary judgment, the defendants asserted with regard to both counts of the plaintiff's second amended complaint that

"[i]t is clear from the depositions in this cause that Lana Dare indicated that she was not interested in riding the motorbike and expressed no interest whatsoever when the subject was brought up by Robert Payne. Because of the lack of interest on the part of Lana Dare there was no duty on the part of Robert Payne or Marcella Payne to perform any of the acts or to refrain from any of the omissions which Plaintiff claims gives rise to the negligence claimed in the Second Amended Complaint. There is no genuine issue as to any material fact and from the facts of this occurrence, as a matter of law, Robert Payne or Marcella Payne had no duty to the Plaintiff's decedent."

The plaintiff subsequently filed a memorandum in opposition to

the motion for summary judgment, to which plaintiff attached, *inter alia,* a copy of that portion of the transcript of the coroner's inquest concerning Lana Dare's death containing Robert Payne's testimony. At the inquest, conducted on June 14, 1984, Robert Payne testified in part as follows:

> "I told her earlier that day she could ride the bike but she didn't want to at that time. I was going to teach her how. She decided to ride, evidently, and one of my children decided that she would ride so she tried to ride while I was taking her sister for a ride and when I got back, it was over."

Plaintiff attached to her memorandum in opposition to the motion for summary judgment a copy of the transcript of the deposition of the defendant Marcella Payne taken on April 24, 1985. The defendant said her daughter had called Lana on the day she died and had asked her if she and Carrie wanted to come over to her house to play. The two Dare girls arrived on their bicycles early in the afternoon. After the family had eaten outside, her husband had given Lana and Jeremy a ride and then, when those two children got off the motorcycle, he had given Carrie and Jared a ride on it. She added, "That is all the riding that had been done except for Jessica and Jeremy had been riding the little bike in the yard." She testified,

> "We told the girls [Carrie and Lana] they could ride the [motor]bike if they wanted to. Right then we was getting ready to eat. We parked the bike and was getting ready to eat. Nothing else was said about it at that time. Then Robert started giving the kids rides and I went in the house."

After the family had eaten, Marcella Payne had taken the things for the cookout into the house. She stated, "We told her [Lana] she could ride the bike earlier. I didn't think she would do it when we weren't there. It was when my husband was gone and I was in the house she decided to ride. I didn't think about her trying it on her own." Her daughter, Jessica, came into the house and told her to come outside to see Lana on the motorbike. As she did so, her husband asked her who was on the motorbike and she saw smoke. The Paynes had had the motorbike, she said, for about 10 days or two weeks prior to this incident: "We got it for Jeremy for graduation from kindergarten." The Payne children were not supposed to go down the embankment or to get near the highway; they rode on the flat part of the Payne property to the front of the house and adjacent to the embankment. She testified further:

> "Jessica said she [Lana] was going to ride it down to Edson's, toward their house, turn around and come back, and apparently

she couldn't make the curve. Instead of going toward the garden, which wouldn't have hurt a thing and she would have been safe, she went the other way, and I guess she was like Justin, she just got too close to that bank and didn't know what to do."

Following argument, the trial court on July 2, 1987, granted the defendants' motion for summary judgment in an entry on the record sheet. On July 8, 1987, the plaintiff moved that the trial court enter "a more detailed order stating the basis for its ruling." In an order entered August 17, 1987, the court stated, "The Court finds that the defendants' Motion for Summary Judgment was granted for the reason that the defendants had no legal duty to avoid any of the acts or omissions which are alleged as elements of negligence in the Second Amended Complaint."

Following a hearing upon the plaintiff's motion for reconsideration of the court's granting of the defendants' motion for summary judgment, the court on September 21, 1987, entered an order denying the motion to reconsider. In that order the court stated in part:

"It is uncontested that the minor decedent child was told by Defendants that she could ride the small motorcycle in question and that Defendant Robert Payne would instruct her in its use. It is also uncontested that decedent stated that she wasn't interested in riding the vehicle. Thereafter, in the absence of Defendants, decedent mounted the motorcycle which had been started by Defendants' minor child, and decedent was killed after riding down an embankment and into the path of a truck passing by on a highway adjacent to Defendants' property.

'Although the degree of care exercised by the defendant is generally a question of fact, it becomes a matter of law where reasonable men of fair understanding could not disagree as to the conclusions resulting from the facts.' *Agnello v. Puzzo* (1982), 110 Ill. App. 3d 913, 917-19, 443 N.E.2d 648, 651-52. *Morrison v. Forest Preserve District* (1987), 155 Ill. App. 3d 687, 689.

Here, reasonable men could not disagree that no duty arose as to this decedent child after she had declined instruction and disavowed interest in riding the motorcycle which became the instrumentality of her death. Although a person looking back on this occurrence might posit some other conduct which Defendant could have taken, the law does not require individuals to imagine all possible series of events."

■ A motion for summary judgment should be granted only

where the pleadings, depositions, admissions, and affidavits establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c); *Beal v. Kuptchian* (1987), 164 Ill. App. 3d 191, 517 N.E.2d 712; *Dealers Service & Supply Co. v. St. Louis National Stockyards Co.* (1987), 155 Ill. App. 3d 1075, 508 N.E.2d 1241; *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 502 N.E.2d 846.) The determination that summary judgment is appropriate will not be reversed absent an abuse of the trial court's discretion such that the plaintiff's right to fundamental justice is violated. *Beal*, 164 Ill. App. 3d 191, 517 N.E.2d 712.

■■ ■ In order to state a cause of action for negligence, a plaintiff must allege the existence of a duty of care owed to the plaintiff by the defendant, a breach thereof, and damages proximately resulting from the breach. (*Dealers Service*, 155 Ill. App. 3d 1075, 508 N.E.2d 1241; *Zimmermann v. Netemeyer* (1984), 122 Ill. App. 3d 1042, 462 N.E.2d 502.) Although the issues of breach of duty and proximate cause are factual matters (*Dealers Service*, 155 Ill. App. 3d 1075, 508 N.E.2d 1241; *Zimmermann*, 122 Ill. App. 3d 1042, 462 N.E.2d 502), the question of the existence of a duty is one of law to be determined by the court (*Mieher v. Brown* (1973), 54 Ill. 2d 539, 301 N.E.2d 307; *Robinson v. The Suitery, Ltd.* (1988), 172 Ill. App. 3d 359, 526 N.E.2d 566; *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 502 N.E.2d 846; *Duncan v. Rzonca* (1985), 133 Ill. App. 3d 184, 478 N.E.2d 603; *Zimmermann*, 122 Ill. App. 3d 1042, 462 N.E.2d 502). If no duty is found to exist, no recovery is possible as a matter of law and summary judgment in favor of the defendant is proper. (*Beal*, 164 Ill. App. 3d 191, 517 N.E.2d 712.) The question of the existence of a duty is determined by considering a number of factors, namely, the foreseeability of harm (*Beal*, 164 Ill. App. 3d 191, 517 N.E.2d 712), the likelihood of the injury, the magnitude of the burden of guarding against it, the consequences of placing that burden upon the defendant, public policy, and social considerations (*Dealers Service*, 155 Ill. App. 3d 1075, 508 N.E.2d 1241). In the absence of any showing upon which the court could infer the existence of a duty, no recovery is possible as a matter of law and summary judgment in favor of the defendant is, therefore, appropriate. (*Loosier v. Youth Baseball & Softball, Inc.* (1986), 142 Ill. App. 3d 313, 491 N.E.2d 933; *Keller v. Mols* (1984), 129 Ill. App. 3d 208, 472 N.E.2d 161.) The facts of a particular case are germane to the determination of the existence of a duty, because the existence thereof depends upon whether, under the facts of the case, such a relationship exists be-

tween the parties as to require the imposition of a legal obligation upon one of them for the benefit of another. *Robinson,* 172 Ill. App. 3d 359, 526 N.E.2d 566.

In the present case the decedent, a 10-year-old child, was visiting the defendants' home in the company of her 11 or 12-year-old sister. Her parents were not present. (*Cf. Kay v. Ludwick* (1967), 87 Ill. App. 2d 114, 230 N.E.2d 494 (mother of a four-year-old child injured while attempting to climb upon a moving riding lawn mower was, like the child, a guest at the defendant's residence when the child was injured; the "primary responsibility" (87 Ill. App. 2d at 119, 230 N.E.2d at 497) for the safety of the minor child rested with its mother).) The motorbike that she was operating at the time of her injury and death was small and apparently intended for use by children; indeed, defendants had purchased this motorbike as a gift for their own six-year-old child. Prior to that visit the decedent had never seen the newly acquired motorbike. Just before eating, the decedent was told by one or more of her adult relatives that she, as well as her sister, could ride the motorbike if she wished. The decedent was asked if she wanted to ride or wanted to learn how to ride the child-sized motorbike but indicated that she did not wish to do so at that time. She was informed by her uncle of how easy the motorbike was to ride and that there was not a lot of difference between operating a two-wheeled motorbike like that one and the three-wheeled vehicle she had operated at her own home. Her cousin of approximately her own age, Jessica, had been riding the motorbike in her presence during her visit. Her even younger cousin, Jeremy, whose bike it was, appears likewise to have been riding it during her visit. Just after eating, her uncle was giving rides on his Harley Davidson motorcycle to the children present, including the decedent. The motorbike was in the front yard of the defendants' residence when the decedent finished riding on her uncle's motorcycle. Moments later she expressed to her cousin the wish to operate the motorbike. Both young cousins helped her to do so. Within minutes she was dead.

■ In view of these facts, as revealed by the pleadings and depositions, we think that in making the determination of the existence of duty in this case the trial court's focus upon a single remark of the decedent was too narrow. Although the decedent indicated that she was not interested in operating the motorbike at the time her uncle told her she could ride it and offered to teach her how to do so, these other facts are highly relevant to the determination of the existence of duty here. They show the likelihood of injury and the foreseeability of harm; they show that the burden upon the defendants, as

the adults in charge, of guarding against harm was slight, particularly when weighed against the enormity of the danger presented. They show a relationship between the decedent and the defendants requiring the imposition of a legal obligation upon the defendants for the benefit of the decedent. We think that under these facts and circumstances, as shown by the depositions herein, the court could well infer the existence of a duty on the part of the defendants to the decedent, Lana Dare, and we accordingly conclude that such a duty existed. As a result, genuine issues remain as to material facts concerning the breach of duty and proximate causation of damages. Thus, summary judgment was improperly granted by the trial court. We therefore reverse the judgment of the circuit court of Jefferson County and remand the cause for further proceedings.

Reversed and remanded.

RARICK and CHAPMAN, JJ., concur.